## UNITED STATES DISTRICT COURT

__NORTHERN__ DISTRICT OF __ILLINOIS, EASTERN DIVISION__

UNITED STATES OF AMERICA

v.

RAFAEL BELTRAN
also known as "RAFY"

FILED
7-8-08
JUL - 8 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**08CR 529**
CRIMINAL COMPLAINT

CASE NUMBER: MAGISTRATE JUDGE COLE

UNDER SEAL

I, the undersigned complainant, being duly sworn state the following is true and correct to the best of my knowledge and belief: On or about __September 27, 2007__ in __Cook__ County, in the __Northern__ District of __Illinois__ defendant,

### Count One

knowingly and intentionally distributed a controlled substance, namely, a mixture and substance containing cocaine, a Schedule II Narcotic Drug Controlled Substance; and

on or about __October 25, 2007__ in __Cook__ County, in the __Northern__ District of __Illinois__ defendant,

### Count Two

knowingly and intentionally distributed a controlled substance, namely, in excess of 50 grams of a mixture and substance containing cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance;

all in violation of Title __21__ United States Code, Section __841 (a)(1)__.

I further state that I am a __Special Agent with the Federal Bureau of Investigation__ and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT.

Continued on the attached sheet and made a part hereof: __X__ Yes ___ No

Jason C. Rahoy, Complainant

Sworn to before me and subscribed in my presence,

__July 8, 2008__
Date

at __Chicago, Illinois__
City and State

Jeffrey Cole, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

STATE OF ILLINOIS    )
                     ) SS
COUNTY OF COOK       )

## AFFIDAVIT

I, Jason C. Rahoy, being first duly sworn on oath, depose and state as follows:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since July 2006, and am presently assigned to the FBI's Joint Task Force on Gangs, Chicago Field Division. In this capacity, I have received specialized training in the enforcement of federal narcotics laws. My training and experience has involved, among other things: (a) the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the distribution and transportation of controlled substances and gang-related criminal activity; (b) surveillance; and (c) analysis of documentary and physical evidence. I have also received training and have experience in investigations involving the interception of wire communications. Based on my training and experience as a FBI agent, I am familiar with the manner in which narcotics traffickers conduct their drug-related businesses, including the methods employed by narcotics traffickers to import and distribute narcotics, their use of telephones in furtherance of their illegal activities, and their use of coded language to refer to narcotics, drug proceeds, and other aspects of narcotics trafficking.

2. I am responsible for investigating crimes that involve, among other things, the unlawful importation of illegal narcotics (21 U.S.C. §§ 952, 960 and 963), the possession with the intent to distribute controlled substances and the distribution of controlled substances (21 U.S.C. § 841), conspiracy to distribute and possession with intent to distribute controlled

1

substances (21 U.S.C. § 846), the use of communication facilities to further these offenses (21 U.S.C. § 843(b)), as well as the laundering of monetary instruments (18 U.S.C. §§ 1956 and 1957). In conducting these investigations, I have used a variety of investigative techniques and resources in several investigations that have included physical and electronic surveillance, monitoring court-authorized wiretaps, the use of confidential sources and informants, and securing other relevant information using other investigative techniques. Through these investigations, my training and experience and conversations with other Special Agents, as well as other law enforcement personnel, I have become familiar with methods used by narcotic traffickers to safeguard their narcotics, to distribute narcotics, and to collect and launder related narcotic proceeds.

3. The following information is based upon my own personal observations, knowledge, and information received from other law enforcement officers, local law enforcement officers (collectively "agents"), and cooperating sources who have proven reliable and provided information which has been independently corroborated. As a result of my participation in this investigation, I am familiar with all aspects of this investigation as described in this Affidavit.[1]

4. Based on the information contained in this Affidavit, I submit that there is

---

[1] The recorded conversations described throughout this Affidavit have been summarized, and parentheses have been placed around language that represent my or other agents' understanding of what is being said during the recordings, based on their content and context, and based on my and other law enforcement officers' experience. In addition, language that is quoted from the recorded conversations throughout this Affidavit is based upon agents' review of the recorded conversations, and are not intended to be a final transcript of the audio recordings from which the quotes are taken.

probable cause to believe that (a) on or about September 27, 2007, RAFAEL BELTRAN, also known as "RAFY" ("BELTRAN") knowingly and intentionally distributed a controlled substance, namely, mixtures containing cocaine; and that (b) on or about October 25, 2007, BELTRAN knowingly and intentionally distributed a controlled substance, namely, in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine; all in violation of Title 21, United States Code, Section 841(a)(1). Since this Affidavit is being submitted for the limited purposes of establishing probable cause, it does not included each and every fact known to me concerning this investigation.

## Background

5.  Since approximately September 2007, $CS1^2$ and $CS2^3$ have been providing reliable, timely information to the FBI. Agents have spoken to CS1 and CS2 in person and telephonically on numerous occasions, and the information provided by CS1 and CS2 has been independently corroborated, including by consensually-recorded telephone calls, controlled

---

[2] CS1 has at least twenty-eight prior arrests and seven prior convictions in the Chicago area, including convictions for: unlawful restraint, aggravated unlawful restraint, robbery, and armed robbery in June 2007; criminal trespass to vehicles in September 1996; receipt/possession of a stolen vehicle in October 1997; burglary, and receipt/possession of a stolen vehicle in March 1993; receipt/possession of a stolen vehicle in December 1988; receipt/possession of a vehicle in December 1988; and burglary in March 1986. In September 2007, CS1 was arrested by the FBI for violation of federal narcotics laws and is cooperating in hopes of receiving a recommendation for a reduced sentence on these charges. No promises have been made to CS1, however, regarding what, if any, consideration CS1 may receive. To the best of Affiant's knowledge, CS1 has never served as a cooperating source in the past.

[3] CS2 has at least two prior arrests in the Chicago area, both in 1994. CS2 is cooperating in hopes of CS1 receiving a recommendation for a reduced sentence in connection with CS1's September 2007 arrest by the FBI for violation of federal narcotics laws. No promises have been made to CS1 or CS2, however, regarding what, if any, consideration CS1 may receive for CS2's cooperation. To the best of Affiant's knowledge, CS2 has never served as a cooperating source in the past.

substance purchases, and physical surveillance.

6.      On or about September 27, 2007, CS1 was shown a Chicago Police Department ("CPD") arrest photograph of BELTRAN, without any visible identifying information on the photograph. CS1 identified the person depicted in the photograph as BELTRAN.[4]

7.      CS2 has known BELTRAN for several years, and during that time period has observed BELTRAN conduct narcotics transactions. CS2 identified BELTRAN's telephone number as (773) 641-8144, which BELTRAN previously provided to CS2 in approximately the Spring of 2007.

### Count One – September 27, 2007 Transaction

8.      On or about September 27, 2007, at approximately 11:36 a.m., CS2 sent a text message to BELTRAN's telephone number (773) 641-8144, that CS2 copied to agents, which read "(CS1) is trying to get up with u. (CS1) just called me. Hit (CS1) bk . . .." At approximately 12:35 p.m., CS2 received a text message from who CS2 believed to be BELTRAN's telephone number (773) 641-8144, that CS2 forwarded to agents, which read "I just got up tell (CS1) they cost 1450 (CS1) knows wat i mean!" At approximately 12:47 p.m., CS2 received a text message from BELTRAN's telephone number (773) 641-8144, that CS2 forwarded to agents, which read "So wat-does-(CS1)-want?—" At approximately 1:26 p.m., CS2 sent a text message to BELTRAN's telephone number (773) 641-8144 that CS2 copied

---

[4] In addition, the identification of BELTRAN in this Affidavit is based upon the following: (1) CS1 made a voice identification of BELTRAN following the consensual recordings detailed below; (2) during the text messages with CS2, BELTRAN arranged to personally meet on September 27, 2007, to consummate the narcotics transactions. During that meeting, agents conducting surveillance of the transaction visually identified BELTRAN as the person who met with CS1 and CS2 based on a CPD arrest photo.

to agents, which read "(CS1) said ok. And i think its a 2N a half.? What time?" At approximately 1:34 p.m., CS2 received a text message from BELTRAN's telephone number (773) 641-8144, that CS2 forwarded to agents, which read "Ask (CS1)-if-its-a-2-and-aquarter-or-a-4 andahalf?" At approximately 1:59 p.m., CS2 received a text message from BELTRAN's telephone number (773) 641-8144, that CS2 forwarded to agents, which read, "Tell (CS1)-2-call-me-when-(CS1)-is-almost-here--."

9. Thereafter, agents provided CS1 with $1,450 in United States currency, and searched CS1, CS2, and CS1's vehicle, and no additional money, narcotics, or contraband were found. Agents provided CS1 audio and video recording devices, and CS1 and CS2 then departed the predetermined meeting location. Agents maintained constant visual surveillance as CS1 and CS2 traveled to the intersection of North Cicero and West Wrightwood Avenues.

10. At approximately 3:33 p.m., agents observed BELTRAN exit the Easy Styles salon located at 2561 North Cicero Avenue, Chicago, Illinois, and walk northbound and approach CS1's vehicle. CS2 was in the driver's seat of CS1's vehicle and CS1 was in the passenger seat of CS1's vehicle. Agents observed BELTRAN speak to CS1 from outside the passenger's side of CS1's vehicle. A few minutes later, agents observed BELTRAN walk away from CS1's vehicle southbound on Cicero Avenue and enter the Easy Styles salon. CS1 and CS2 departed the area, and were observed by agents continuously while traveling to the predetermined meeting location to meet with agents. CS1 provided agents one clear plastic baggy containing suspected powder cocaine. Agents searched CS1, CS2, and CS1's vehicle, and no additional narcotics, money, or contraband were found.

11. A review of the audio and video recording, as well as a debriefing with CS1 and CS2 after the transaction revealed the following: After CS1 and CS2 arrived at North Cicero and West Wrightwood Avenues, BELTRAN approached the passenger's side of CS1's vehicle, where CS1 was seated, and threw a plastic baggy containing suspected powder cocaine inside. CS1 counted the money and gave BELTRAN the $1,450. CS1 asked BELTRAN, "man, you sure this shit come back . . .(good quality cocaine to be processed into crack cocaine)." BELTRAN told CS1, "look, if you know cocaine, look at it . . . . Open it, smell it. . . ." and that it was "fish (good quality cocaine)."

12. Based on my experience, the substance contained in the plastic baggy obtained from BELTRAN was consistent with the appearance of cocaine. The substance was submitted to the Drug Enforcement Administration laboratory where it tested positive for 62.1 grams of cocaine hydrochloride.

### Count Two – October 25, 2007 Transaction

13. On or about October 22, 2007, at approximately 6:39 p.m., CS1 placed a consensually recorded telephone call to BELTRAN at telephone number (773) 641-8144. During this call, BELTRAN asked CS1, "Do you want to do somethin'?" CS1 replied that CS1 did. BELTRAN told CS1 that it would have to take place the following morning (Tuesday, October 23, 2007). CS1 agreed to call BELTRAN the following morning at approximately 11:00 a.m.

14. On or about October 24, 2007, at approximately 5:30 p.m., CS1 placed a

consensually recorded telephone call to BELTRAN at telephone number (773) 641-8144.[5] During this call, CS1 asked BELTRAN "tomorrow," and BELTRAN told CS1 that it was up to CS1 (when CS1 wanted to make the narcotics purchase of crack cocaine). BELTRAN asked CS1 "do you want me to whip it up today (process powder cocaine into crack cocaine) . . ." CS1 told BELTRAN to "whip it up . . . (process powder cocaine into crack cocaine)." BELTRAN asked CS1, "how do you want it, like, regular or a little bit more?" CS1 then asked BELTRAN how much he would charge CS1. BELTRAN told CS1, "14 ($1,400)." CS1 told BELTRAN to give CS1 "two (two - two and a quarter ounce quantities of crack cocaine)." BELTRAN repeated "two of 'em?" and asked "alright, both of them whipped up (both two and a quarter ounce quantities of powder cocaine processed into crack cocaine)?" CS1 replied yes. Following this call, CS1 explained to agents that BELTRAN agreed to sell CS1 two- two and a quarter ounce quantities of crack cocaine for $1,400 per package, for a total price of $2,800.

15. On October 25, 2007, at approximately 3:41 p.m., CS1 received an incoming telephone call from BELTRAN over telephone number (773) 641-8144. This call was received in the presence of agents, but was not recorded due to a technical malfunction. According to CS1, during this call BELTRAN asked CS1 where CS1 wanted to meet. CS1 replied that they should meet at the same location they met on a prior occasion. BELTRAN told CS1 to meet CS1 there in 15 minutes.

16. At approximately 3:45 p.m., agents provided CS1 with $2,800 in United States

---

[5] The preamble to this consensually recorded telephone call incorrectly identified the dialed telephone number as (773) 841-8144. The telephone number that CS1 actually dialed was (773) 641-8144, which is BELTRAN's telephone number.

currency to purchase the drug evidence. Agents searched CS1 and CS1's vehicle and no additional money, drugs or contraband were found, and provided CS1 with audio and video recording devices.

17. At approximately 3:58 p.m., CS1 departed from the predetermined meeting location in CS1's vehicle. Agents observed CS1 continually while en route to the intersection of North Cicero and West Wrightwood Avenues. At approximately 4:08 p.m., CS1 placed a consensually recorded telephone call to BELTRAN. During this call, BELTRAN told CS1 that he was at Cicero, and told CS1 to "park in that same spot . . .."

18. At approximately 4:12 p.m., agents observed CS1 travel east on West Wrightwood Avenue and then park on the south side of the street in the vicinity of North Cicero and West Wrightwood Avenues. Shortly thereafter, agents observed a grey Toyota Camry, Illinois license G35-8018, travel east on West Wrightwood Avenue, and park on the north side of the street across the street from CS1's vehicle.

19. A few moments later, agents observed BELTRAN, accompanied by two children, exit the Camry. BELTRAN crossed West Wrightwood Avenue and approached the driver's side of CS1's vehicle. Agents observed BELTRAN toss a small item into CS1's vehicle. Agents observed BELTRAN walk away from CS1's vehicle and the CS1 departed the vicinity.

20. Agents maintained continual surveillance of CS1 as CS1 traveled to the predetermined meeting location to meet with agents. At that time, CS1 provided agents with two clear, plastic baggies containing an off-white, rock-like substance that CS1 acknowledged was just obtained from BELTRAN. Agents again searched CS1 and CS1's vehicle for money,

drugs and other contraband, with negative results. A review of the audio and video recording, as well as a debriefing with CS1 after the transaction revealed the following: BELTRAN retrieved two plastic baggies from his left jacket pocket and gave the baggies to CS1. CS1 then provided BELTRAN the $2,800. BELTRAN asked CS1, "It's all here?," and CS1 replied, "Yeah."

21. Based on my experience, the substances contained in the plastic baggies obtained from BELTRAN were consistent with the appearance of crack cocaine. The substances contained in the two plastic baggies were submitted to DEA laboratory for analysis where it tested positive for 121.7 grams of cocaine base.

22. Based on the foregoing, I believe there is probable cause that (a) on or about September 27, 2007, RAFAEL BELTRAN knowingly and intentionally distributed a controlled substance, namely mixtures containing cocaine; and that (b) on or about October 25, 2007, RAFAEL BELTRAN knowingly and intentionally distributed a controlled substance, namely in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine; all in violation Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

Jason C. Kahoy, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this ___ day of July, 2008.

JEFFERY COLE
MAGISTRATE JUDGE